IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| In re:<br>**CHARLES STEPHEN GOODMAN,**<br>Debtor. | Case No. 23-50226<br>Chapter 7<br>Judge John W. Kolwe |
| **FUNDAMENTAL FUNDING, LLC,**<br>Plaintiff,<br>v.<br>**CHARLES STEPHEN GOODMAN,**<br>Defendant. | Adv. Proc. No. 23-05008 |

**PLAINTIFF'S STATEMENT OF FACTS IN SUPPORT OF SUMMARY JUDGMENT**

**COMES NOW** plaintiff, Fundamental Funding, LLC ("Plaintiff"), by and through its undersigned counsel and, in support of its Motion for Summary Judgment against debtor, Charles Stephen Goodman ("Debtor") and submits the following statement of facts as to which Plaintiff contends there is no issue to be tried:

1. Plaintiff is a commercial lender who provide commercial loans to businesses throughout the United States. *See* Affidavit of Tim Haddock attached hereto as Exhibit "1" (the "Affidavit").

2. Plaintiff was and is a party to a commercial loan agreement with Cuba Timber, Inc. d/b/a Cuba Timber Co. and its affiliates (collectively, "Cuba Timber"). *Id.*

1

3.  Debtor is, and has been at all times material to this action, the President, owner, and operator of Cuba Timber. *Id.*

4.  Cuba Timber is in the timber business. As such, it negotiates contracts with landowners to acquire and cut timber to be sold to various end users. *Id.*

5.  On or about August 4, 2015, Plaintiff and Cuba Timber entered into a Loan and Security Agreement (the "Loan Agreement"). A copy of the Loan Agreement is attached to the Affidavit as Exhibit "A."

6.  Prior to entering in the Loan Agreement, Plaintiff performed a physical examination and analysis of Cuba Timber's inventory and accounts receivable, which is documented in the thirteen page report attached to the Affidavit as Exhibit "B."

7.  Pursuant to the Loan Agreement, Plaintiff agreed to provide to Cuba Timber two revolving loans against its accounts receivable and inventory, identified as "Revolving Loan I" and "Revolving Loan II" (each a "Loan" and, together, the "Loans").

8.  The Agreement defines the Borrowing Base as follows:

    > [W]ith respect to [Revolving Loan I], the Borrowing Base shall mean 90.00% of the amount of Borrower's Eligible Accounts, and, with respect to the [Revolving Loan II], shall mean up to 50.00% of the amount of [Cuba Timber's] Eligible Inventory…

Id.

9.  As collateral for the Loans, Cuba Timber granted a security interest in Cuba Timber's accounts and inventory, as well as blanket security interest in other personal property. *See* Exhibit "A" at Section 2.

10. The Agreement provides that, in order to obtain a Loan from time to time, Cuba Timber was required to deliver to Plaintiff a Borrowing Base Certificate. *Id.* at Section 1.5.

11.     The Borrowing Base Certificates each include information as to the amount of Cuba Timber's current Eligible Accounts and Eligible Inventory, as said terms are defined in the Loan Agreement, so that Plaintiff may make determinations as to the appropriate amount to advance to Cuba Timber in accordance with the Commercial Schedule to the Loan Agreement. *See* Affidavit.

12.     Throughout Plaintiff's lending relationship with Cuba Timber, Plaintiff reasonably relied upon the Borrowing Base Certificates to determine the amount of credit to extend to Cuba Timber and to gauge its collateral position. *See* Affidavit.

13.     In connection with the Loans, Debtor executed a Surety Agreement (the "Surety Agreement"). A copy of the Surety Agreement is attached to the Affidavit as Exhibit "C."

14.     Pursuant to the Surety Agreement, Debtor agreed to:

> absolutely and unconditionally guarantee[] to [Plaintiff], agree[] to be liable for, and agree[] to make the full and timely payment of all amounts or debts [Cuba Timber] owes to [Plaintiff], including but not limited to all principal, additional principal, obligations, interest, legal fees, expenses and costs, and any and all other charges [Cuba Timber] owes to [Plaintiff] under, pursuant to or in connection with the [Agreement] and the [Loans], as modified, amended or replaced from time to time, whether such obligations are now in existence or arise after the date of this Agreement.

Exhibit "C" at Section 2.01.

15.     The Surety Agreement further provides that "[a]ll expenses of [Plaintiff], including but not limited to reasonable attorneys['] fees and repossession costs, shall be added to the outstanding principal in the event of any default." *Id.* at Section 3.04.

16.     On or about August 4, 2015, Cuba Timber resolved, at a meeting of its officers, that Debtor, as President of Cuba Timber, and Cathy Griffith ("Griffith"), as Treasurer and office manager of Cuba Timber, were expressly authorized to act on behalf of Cuba Timber to perform

3

certain activities related to the Loan Agreement. A copy of the Cuba Timber Secretary's Certificate of Resolution is attached to the Affidavit as Exhibit "D."

17. Specifically, the Cuba Timber Secretary's Certificate of Resolution (the "Resolution") provides that Debtor and Griffith are authorized on behalf of Cuba Timber to "arrange for any borrowings or other financing obligations with [Plaintiff] from time to time..." *See* Exhibit "D."

18. Pursuant to the Loan Agreement, Cuba Timber represented and warranted to Plaintiff as to its accounts that:

> Each Account with respect to which Loans are requested by [Cuba Timber] shall, on the date each Loan is requested and made, (i) represent an undisputed bona fide existing unconditional obligation of the Account Debtor created by the sale, delivery, and acceptance of goods or the rendition of services, or the non-exclusive licensing of Intellectual Property, in the ordinary course of [Cuba Timber's] business, and (ii) meet the Minimum Eligibility Requirements set forth in Section 8 [of the Loan Agreement].

*See* Exhibit "A" at Section 4.1(a).

19. Pursuant to the Loan Agreement, Cuba Timber further represented and warranted to Plaintiff as to its inventory that:

> (i) All Eligible Inventory is of good and merchantable quality, free from defects; and (ii) as to each item of Inventory that is identified by [Cuba Timber] as Eligible Inventory in a Borrowing Base Certificate submitted to [Plaintiff], such Inventory is not excluded as ineligible by virtue of one or more of the excluding criteria set forth in the definition of Eligible Inventory.

Id. at Section 4.1(b).

20. On February 17, 2017, Debtor signed a Borrowing Base Certificate stating that Cuba Timber had $1,083,822.77 in Eligible Accounts and $747,076.43 in Eligible Inventory. A

4

copy of the February 17, 2017 Borrowing Base Certificate is attached to the Affidavit as Exhibit "E."

21. Debtor later testified[1] that the $747,076.43 in inventory was completely fabricated and that Cuba had **no saleable inventory** on February 17, 2017, stating:

```
Q    Mr. Goodman, my name is Clark Hammond.  We briefly met
before the hearing, and I represent Fundamental Funding.  I
want to focus on what we last ended with, which is this wood
pile.  Was the Aliceville location the only place where you
stockpiled wood?
A    Yes.
Q    Okay.  And you said that the last time you had any useable
wood there was February 17th of this year?
A    Yes, sir.
Q    And what did you have there at that time?
A    Zero.
Q    Zero?
A    February 17th?
Q    Yeah.
A    Yeah, we had run out.
```

*See* Exhibit "2," Pages 36 and 37.

22. As to the Eligible Accounts, on February 24, 2017, the day Cuba Timber filed bankruptcy, Cuba Timber submitted a Borrowing Base Certificate stating that it had $1,269,842.41 in Net Accounts and $1,133,819.04 in Eligible Accounts. A copy of the February 24, 2017 Borrowing Base Certificate is attached to the Affidavit as Exhibit "G." Debtor testified that this amount was false as well, stating:

---

[1] The Transcript of March 2, 2017 hearing on Cuba Timber's Emergency Motion to Use of Cash Collateral during which Debtor testified is appended as Exhibit 2 to Debtor's Exhibits in Support of Summary Judgment.

> Q    And do you recall that you received that $39,000 that you requested on the day you filed bankruptcy?
>
> A    Right.
>
> Q    Okay. So that's all correct and you did submit a request on the same day that you filed bankruptcy?
>
> A    Right. From the tickets from the 23rd.
>
> Q    If you'll look at that, it shows that the accounts receivable under Number 5 say 1.269 million, do you see that?
>
> A    Uh-huh.
>
> Q    Was that true?
>
> A    No.

*See* Exhibit "2," Pages 39 and 40.

23. Debtor later testified that Cuba Timber had only $250,000.00 in accounts receivable on February 24, 2027, stating:

> Q    Okay. All right. Now, you mentioned that at the time you filed bankruptcy you had $250,000 in accounts receivable.
>
> A    Uh-huh.
>
> Q    Is that all the accounts receivable that good, bad or ugly, old, new, all accounts receivable regarding of how -- regardless of how old it was?
>
> A    That's what I was told on the schedule, yeah.

*See* Exhibit "2," Page 38.

24. Cuba Timber ultimately pinned the accounts receivable figure to be $202,258.39 as of the petition date of February 24, 2017. A copy of the Amended Schedule in which the accounts are valued is attached as Exhibit "3."[2]

---

[2] Although Debtor did not testify, specifically, that the $1,083,822.77 of Eligible Accounts on the February 17, 2017 Borrowing Base Certificate was also misrepresented, no set of facts could support that Cuba Timber had $1,083,822.77 in accounts on February 17, 2017, but only $202,258.39 on February 24, 2017. The reasonably

6

23-05008 - #18  File 04/16/24  Enter 04/16/24 13:15:13  Main Document  Pg 6 of 11

25. Although Debtor did not sign the February 24, 2017 Borrowing Base Certificate as he did the February 17, 2017 Borrowing Base Certificate, he testified that he was the source of the information and he gave Griffith authority to act in the aforementioned Secretary's Certificate of Resolution. Debtor testified:

> Q   Okay. And Ms. Griffith, is that her name?
> A   Uh-huh.
> Q   Does she do all of your bookkeeping?
> A   Yes.
> Q   Okay. And she's the one that signs the borrowing base certificates with our client, isn't she?
> A   Yes, I think I do some, but she --
> Q   All right. And do you look over those borrowing base certificates before they're sent in?
> A   What I do is every morning from my house I kind of figure up what the -- I go on each of these mill sites and see what our sales was that day and that's kind of what I do, keep up with it like that.
> Q   Okay. And do you recall submitting a borrowing base certificate to our client on the same day that you filed bankruptcy?
> A   Probably, yeah.

And he later testified that he, and not Griffith, knew that the Borrowing Base Certificates were fabricated:

---

conclusion is that Debtor fabricated all of the Borrowing Base Certificates, at least, in the weeks leading up to the bankruptcy.

```
Q   Was there $696,000 of inventory?
A   Mm-mm.
Q   So that wasn't true either, was it?
A   No, which Cathy didn't know that, but no wood there.
Q   But you did?
A   Yeah.
```

*See* Exhibit "2," Pages 38, 39, and 41.

26.     On February 24, 2017, after Cuba Timber had submitted its Borrowing Base Certificate and received $39,000.00 from Plaintiff based on that certificate, Cuba Timber filed a voluntary petition for relief in bankruptcy under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, in the United States Bankruptcy Court for the Northern District of Alabama at Case No. 17-70349-DSC-11. *See* Affidavit.

27.     Each of the aforementioned Borrowing Base Certificates contains the following representations:

> This Borrowing Base Certificate and supporting data…is delivered in accordance with the [Loan Agreement]… [Cuba Timber] represents and warrants to [Plaintiff] that this Certificate is true, correct, and based upon information contained in [Cuba Timber's] financial and accounting records. By executing this Certificate[,] [Cuba Timber] hereby ratifies, confirms, and affirms all of the terms, conditions, and provisions of the Loan Agreement and any Amendments thereto, and further certifies on this day that NO DEFAULT or EVENT OF DEFAULT has occurred and is continuing and [Cuba Timber] is otherwise in compliance with the Loan Agreement and any Amendments.

See Exhibit "E."

28.     Including the February 17, 2017 and February 24, 2017 certificates, Cuba Timber submitted to Plaintiff seventeen (17) Borrowing Base Certificates during the month of February 2017. Borrowing Base Certificates for February 1, 3, 6, 7, 9, 10, 13, 14, 15, 16, 17, 21, 22, 23 and 24, 2017 are attached to the Affidavit as Exhibit "G." Based on Debtor's testimony and the

8

Amended Schedules, the Borrowing Base Certificates submitted by Debtor and Griffith are materially false. *See* Affidavit.

29. Had Cuba Timber not made the false representations in the Borrowing Base Certificates, Plaintiff would not have continued to lend to Cuba Timber. *See* Affidavit.

30. There was nothing in the business dealings between Cuba Timber and Plaintiff from 2015 to 2017 that would have indicated to Plaintiff that Cuba Timber had almost entirely fabricated its Borrowing Base Certificates. *See* Affidavit.

31. As of the date of the filing of the Bankruptcy Action, the amount of Cuba Timber's outstanding Loans from Plaintiff totaling $1,692,162.30 that were supported by collateral with a value of only $202,258.39. *See* Affidavit.

32. Plaintiff received a distribution in Cuba Timber's bankruptcy case in the amount of $180,000.00, leaving a balance of $1,512,162.30. In addition to the $1,512,162.30 balance, Debtor is obligated to Plaintiff for reasonable attorneys' fees under his Surety Agreement. *See* Affidavit.

33. In his Schedules, the Debtor listed Plaintiff as an unsecured creditor in the amount of $617,983.80 without any claim the amount was contingent, unliquidated or disputed. *See*, Doc. 1, , pg. 27 of 29, Section 4.2.4.

Dated the 16th of April, 2024.

                Respectfully submitted,

              By: /s/ Joseph P. Hebert
                Joseph P. Hebert
                (LA #6734; TX #00789095)
                John M. Parker
                (LA #40004)
                LISKOW & LEWIS
                1200 Camellia Blvd., Suite 300
                Lafayette, LA 70508
                P.O. Box 52008

Lafayette, LA 70505-2008
Telephone: (337) 232-7424
Fax: (337) 267-2399
Email: *jphebert@liskow.com*
      *jparker@liskow.com*

*\*\*\*and\*\*\**

By: /s/ Clark R. Hammond
Clark R. Hammond
Wallace Jordan Ratliff & Brandt LLC
800 Shade Creek Parkway, Suite 400
Birmingham, Alabama 35209
Direct dial 205-874-0331
Fax 205-874-3240
Email: *chammond@wallacejordan.com*
*Admitted pro hac vice*

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing *Statement of Facts in Support of Motion for Summary Judgment* filed by Fundamental Funding, LLC on April 16, 2024 was served by depositing a copy of same in the United States First Class Mail, properly addressed to interested parties and postage prepaid, and upon all parties or counsel of record who have registered to receive electronic service by operation of the Court's electronic filing system, as follows:

> H. Kent Aguillard
> 141 S. 6th Street
> Eunice, LA 70535
> Email: *kent@aguillardlaw.com*
> *Counsel for Defendant Charles
>   Stephen Goodman*

Lafayette, Louisiana, this 16th day of April, 2024.

       /s/ Joseph P. Hebert
       Joseph P. Hebert

11

23-05008 - #18  File 04/16/24  Enter 04/16/24 13:15:13  Main Document  Pg 11 of 11